## STONE *vs.* SEYMOUR & BOUCK.

In an action against *sureties*, on a bond conditioned that their principal, a *collector of tolls*, should *pay over* all monies received by him, IT WAS HELD, ·that the *intention* of the collector that certain payments made by him should be specifically applied *might be inferred from circumstances*, and that the jury were authorized to make *appropriations* accordingly, and apply payments in extinguishment of defalcations existing previous to the accruing of the liability of the sureties, although large portions of the payments thus appropriated arose from tolls collected after the accruing of the liability of the sureties and the payments were credited at the accounting office on a *general account:* no direction or intimation being given by the collector, at the time of the payments, as to any *specific appropriations*, and none being in fact made by the accounting officer.

Where, however, payments were made by the collector after a *new bond* with *new sureties* was given by him, and there were no directions to appropriate, or circumstances from which an intention on the part of the collector to appropriate such payments to any particular items of indebtedness could be inferred, and the moneys when received by the accounting officer were placed generally to the credit of the collector on the *general account* kept with him, IT WAS HELD, that the sureties to the *first* bond were not entitled to credit for the payments made subsequent to the execution of the second bond : the new sureties being entitled to the benefit of such payments to countervail the claims existing against the collector, for monies received by him as tolls after the accruing of their liability.

Doctrine of the *appropriation* of payments, considered and discussed.

ERROR from the supreme court. Seymour and Bouck brought an action in the supreme court against C. A. Van Slyck, E. Stone and others, on a bond given to them as canal commissioners, the condition of which was that Van Slyck

should *pay over all* monies received by him as *collector of tolls* on the Erie canal, at Rochester, and well and truly execute the office of collector. The bond bears date 1st June, 1825. The collector made *monthly* returns to the comptroller's office at Albany of the tolls received by him, and according to such returns he was charged on the books of the comptroller, with the sum of $77,230,\frac{98}{100}$, as tolls collected from the 1st June, 1825, to the 4th May, 1826; the tolls of *April*, 1826, amounting to $9007,85, and of *May* up to the *fourth* day of that month, amounting to $2192,73, being included in the above sum of $77,230,\frac{98}{100}$. *On the 14th April*, 1826, *a new bond with new sureties was executed.* Between the 1st June, 1825, and the 14th April, 1826, Van Slyck paid into the treasury $65,921,\frac{73}{100}$; seven days after the 14th April, 1826, he paid the further sum of $891,97, and on the 5th June following $9,417,89. The plaintiffs claimed to recover the monies received by Van Slyck between 1st June, 1825, and 14th April, 1826, not paid over by him, and exhibited a *statement of their demands*, showing a balance in their favor of $11,316,\frac{31}{100}$. In this statement Van Slyck was *debited* with the tolls of the months of *June* and the following months in 1825, and with the tolls of the first thirteen days in April, 1826, the whole amounting to $66,525,\frac{31}{100}$—the tolls for the 13 days in April being charged at $557,90, which was the amount collected; and he was *credited* with payments to the amount of $55,209, leaving the above balance of $11,316,\frac{31}{100}$. The first sum credited is $11,436,\frac{20}{100}$, paid on the 23d *August*, 1825; then follow sundry credits down to 28th February, 1826; next $891,-07, paid 21st April, 1826, and then a credit as of 5th June, 1826, $557,90, to satisfy the tolls of April, 1826; and on the same day a credit of $410,04, the surplus of the payment of 5th June, beyond the tolls of April, 1826, *omitting, in this statement to credit Van Slyck with a payment of* $12,571,\frac{54}{100}$, *made on the 22d* JULY, 1825, *although the tolls received by him during the month of June amounted to upwards of* $11,000, *and during the month of July to upwards of* $6,000. Besides the above sum of $77,230,\frac{98}{100}$, there stood on the books of the comptroller two charges against Van Slyck: one for *tolls* of the month of *April*, 1825, amounting to $9,939,\frac{63}{100}$, and another for *tolls* of the

ALBANY,
Dec. 1835.

Stone
v.
Seymour.

following month of *May*, amounting to $12,571,$\frac{54}{100}$; and the plaintiffs insisted that they had a right to claim that the payment of *July*, 1825, should be applied in extinguishment of the charge for tolls of the month of *May* preceding, it being precisely of the same amount with the payment. The defendants insisted that the plaintiffs were not entitled to have such appropriation made ; and further insisted that they, the defendants, were entitled to a credit of at least $1135, part of the sum of $9936,$\frac{63}{100}$, credited to Van Slyck, on the books of the comptroller as of the 30th May, though not in fact paid until the 4th June, and gave evidence to raise the presumption that at least the sum of $1125 was composed of tolls received by Van Slyck on that day; while on the other hand the plaintiffs insisted that they had a right to claim that the whole of the payment of $9936,$\frac{63}{100}$ should be applied towards payment of the tolls of *April*, 1825, the amount being only $3 less than the tolls of April, and therefore might well be presumed to have been intended to be paid in extinguishment of the tolls of that month. In support of the presumption of the *intent* of Van Slyck that the payment of *May* should apply in discharge of the tolls of *April*, and the payment of *July* in discharge of the tolls of *May*, it was shown that on the 30th May the only charges on the books of the comptroller against Van Slyck were the tolls of *April*, and the $15,$\frac{84}{100}$ the tolls, of the preceding month of March, and that the monthly return for *May* was not even made until *after* the 20th June. So in relation to the payment of the 22d July, it was shown that on that day the only charges against Van Slyck were the tolls for the month of May, and the above balance due in March, and that the monthly return of *June* was not made until after the 28th day of July. It appeared that Van Slyck held the office of collector from the 2d July, 1824, until the 4th May, 1826, when he was superseded ; that from the commencement to the termination of his office, a *general account* was kept with him at the comptroller's office, in which he was *debited* with the several amounts specified in his monthly returns, and credited with all payments made by him ; that *no direction* or *intimation* was at any time given by him as to any *specific appropriation* to be made of either of the payments; and

no specific appropriation was ever made by the comptroller. All payments were credited in *general account* as, and when received, and in keeping the account the comptroller had no reference to the different sureties of Van Slyck, and down to the time of the trial there was not even a balance struck in the books of the comptroller. Van Slyck, at the time of the trial, was shown to be insolvent.

The judge charged the jury that there was not sufficient evidence to entitle the defendants to a credit for the payment made in *May*, 1825, or for any part thereof. As to the payment of *July*,1825, he charged that the *intention* of Van Slyck to have it specifically applied in satisfaction of the tolls of the month of *May* preceding, might be inferred from circumstances ; and if, from the facts and circumstances of the case, they should believe that it was intended that such payment should be so applied, they ought to exclude the same from the credits to be allowed the defendants ; and in regard to the payment of the 5th June, he instructed the jury, that it having been made after Van Slyck had given new sureties, such *new sureties* were entitled to the benefit of that payment, unless it was composed of monies received for tolls previous to the 14th April, 1826, and unless they should find that a greater sum than $967,$\frac{94}{100}$, (a portion of the payment of 5th June credited by the plaintiffs to the defendants,) had been received for tolls previous to the 14th April, 1826, the defendants were not entitled to any further credit on that account than the said sum of $967,$\frac{94}{100}$. The jury found a verdict for the *whole sum* claimed by the plaintiffs, with the interest thereof.

The above verdict was found on a *second trial* had in this cause, there having been a previous trial in which also a verdict was found for the plaintiffs, but which was set aside by the court, and a new trial ordered, on the application of the defendants. The principal questions arising on the first trial were again raised on the second, and, presented by a bill of exceptions to the supreme court, on a motion for a *second new trial*. The court considering the whole case, disposed of by their previous decision, refused a second new trial, for the reasons assigned in the opinion delivered on the first motion, by Mr. Justice SUTHERLAND. *See same*, 8 *Wendell*, 414, *et*

*seq.* The defendant *Stone,* one of the sureties of Van Slyck, thereupon sued out a writ of error, removing the record into this court, where the cause was argued by

*D. D. Barnard,* for the plaintiff in error.

*Greene C. Bronson,* (Attorney General) for the defendants in error.

The following opinions were delivered :

By the CHANCELLOR. Upon examination I have been surprised that there does not appear to be any settled rules, except in two or three cases, as to the application of indefinite payments where the creditor has different claims against his debtor, either in England or the United States, or in those countries whose general principles of jurisprudence are based upon the rules of the Roman, or civil law. Some of the fundamental principles of the civil law appear to have been adopted every where, and to admit of no doubt : 1. If both debts are due at the time of the partial payment, the debtor is at liberty to apply the payment to which he pleases, if his intention is manifested at the time of the payment ; subject to this restriction, however, that the creditor is not obliged to receive a partial payment of any particular debt, of which the whole is due at the time the offer of payment is made. 2. Where the debtor neglects to manifest his intention as to the application of the payment, at the time it is made, the creditor may, at the time he receives the money, apply it to which debt he pleases, unless the debtor objects ; the creditor manifesting his intention at the time, either in the acquittance which he gives, or in some other way. 3. If a partial payment is made, on account of debts, one part of which debts consists of the principal and another of the interest or compensation due for the use of the capital of such debts, so much of the payment as is necessary to satisfy the interest, or arrears then due, shall be first applied for that purpose, and the residue only shall go to reduce the amount of the principal debt. These rules prevailed in the Roman or civil law, and are now the settled law of France, Spain, Holland, Scotland, England

ALBANY,
Dec. 1835.

Stone
v.
Seymour.

and the United States.    1 *Domat, B. 4, tit.* 1, § 4, *art.* 1, 3, 5, 6.    *Nap. Code, art.* 1253, 1254, 1255.    5 *Partida, tit.* 14, *Law* 10.    2 *Moreau & Carl. Transl.* 912.    *Vander Linden's Inst. of Holland, B.*1, *ch.*18, § 1.    *Henry's Transl.* 267.    *Bell's Law of Scot. art.* 562, *p.* 135.    2 *Bell's Com.* 535.    *Wood's Civ. Law,* 293.    1 *Evans' Poth.* 328, *No.* 528. *Anon. Cro. Eliz.* 68.    *Bois* v. *Cranfield, Style,* 239.    *Haynes* v. *Harrison,* 1 *Ch. Ca.* 106.    *Crisp* v. *Bluck, Finch's Rep.* 89.    *Wilkinson* v. *Sterne,* 9 *Modern,* 427.    *Field* v. *Holland,* 6 *Cranch,* 27.    *United States* v. *Kirkpatrick,* 9 *Wheat.* 737. *Taylor* v. *Talbot,* 2 *J. J. Marsh. Rep.* 49.    *Baker* v. *Stackpole,* 9 *Cowen,* 420.    *Civ. Code of Louis. Art.* 2159, 2160, 2161. *Hart* v. *Dewey,* 2 *Paige's Rep.* 207.   The last of these principles is also supported by all of the English and American cases in which the rule has been settled as to the computation of interest, when partial payments have been made upon accounts or demands drawing interest, and where both principal and interest were due at the time of such payments.   A fourth principle appears to be equally well established, to wit: where no application of the payment is made by the debtor, or with his assent, at the time it is received, and there is an existing indebtedness to the amount of such payment, it shall be applied to that ; and neither the creditor nor the court shall apply such payment to a debt which was not then due and payable.   And if the payment is made upon a demand which draws interest, and neither the principal nor the interest have yet become due, it shall be applied rateably ; so as to extinguish the interest to that time, upon so much of the principal as is discharged by the payment.   *Williams* v *Houghtaling,* 3 *Cowen's Rep.* 87.    *Tracy* v. *Wikoff,* 1 *Dallas,* 124.

Thus far the English and American decisions are uniform, and correspond with the principles of the law of Scotland and of the continent of Europe.    To this extent the maxim *quicquid solvitur, solvitur secundum modum solventis,* prevails ; and the application of the payment is made according to the supposed intention of the debtor, whether such intention is actually expressed or only implied from the circumstances under which the payment was received.    Indeed courts have very frequently applied a payment, in conformity with the implied

intention of the debtor at the time he made such payment, upon circumstantial evidence alone. *See Shaw* v. *Picton,* 7 *Dow & Ryl. R.* 201; *Taylor* v. *Rymer,* 3 *Barn. & Adol.* 333; *Marryatts* v. *White,* 2 *Starkie,* 101; *Scott* v. *Fisher,* 4 *Monro,* 387; *Robert* v. *Garnie,* 3 *Caines,* 14; *Brett* v. *Marsh,* 1 *Vern.* 469. This principle is applicable in the present case to the several payments of the 30th of May, the 22d of July, and the 23d of August, 1825; for, from the circumstances proved on the trial, there can be no possible doubt that at the times those several payments were made, Van Slyck *intended* they should apply to the tolls of April, May and June of the same year. He knew at the time each payment was made, or rather he supposed that his account for a previous month, corresponding in amount with such payment, was the only account standing against him on the books of the comptroller; unless it might have been the small sum of $15,84, for the tolls of March. The account for the previous year had been paid in full on the 9th of April, and the errors in that account had not then been discovered and charged to him. He also knew, from the regulations then in force, requiring monthly returns only, that it was not expected he would pay the monies collected for tolls into the treasury oftener than once a month. In each instance, therefore, he waited a few days after the payment (for the amount of his return of one month) had been sent to the comptroller, before he made the affidavit and transmitted the return for the next month; and apparently for the sole object of having the first account upon the books of the office for the tolls of one month satisfied, before he was charged with the tolls received in the next. Under these circumstances, I not only think the jury were authorized to find, but I do not see how they could do otherwise than find, that Van Slyck actually intended, at the time he made those payments respectively, that they should apply to the payment of the tolls for the previous months, as then charged to him upon the comptroller's book, corresponding therewith in amount.

A recent decision in the house of lords in England is directly in point on this part of the case. I refer to the case of *Lysaght* v. *Walker,* 5 *Bligh, N. S.* 1. In that case, Walker & Co. were brewers, and had an agency for the sale of ale

ALBANY,
Dec. 1835.

Stone
v.
Seymour.

and porter, at Banagher in Ireland. P. Considine, wishing to be employed as their agent at that place, brought a letter of credit to them from Lysaght, in which the latter promised that he would be answerable to them in the sum of £500, for the faithful discharge of the trust reposed in Considine as such agent. Weekly returns of the receipts and disbursements of the agency were transmitted by Considine to Walker & Co., and the monies were from time to time sent to them and entered on account. In February, 1821, he removed to Loughrea, where Walker & Co. had another agency of the same kind, and he continued in their employ, at that place, until his death in May of the same year; transmitting weekly statements in the same manner, and remitting balances from time to time, which were passed to his credit in the account. At the time of his removal from B. there was a balance in his hands of about £379; but the total amount of the monies which he had remitted from Loughrea exceeded the balance due from him at the time of his removal to that place; and the amount which was still in his hands at the time of his death exceeded the £379. Lysaght being sued upon his guaranty, to recover the balance which was due at the time his responsibility for monies received by the agent terminated, by the change of his place of employment; upon the trial before Baron Pennefather, the defendant's counsel insisted that the subsequent payments must be applied to the previous indebtedness. The judge refused to give such instructions to the jury, but left it to them to determine upon what account the remittances from Loughrea were made. The defendant took an exception to the charge, and the jury found a verdict for the plaintiffs for the balance in the hands of the agent at the time of his removal from Banagher; and the courts of exchequer and exchequer chamber in Ireland, and finally the house of lords in England, held that the decision of the judge who tried the cause was right. I have no doubt, therefore, that the decision of the court below was right, in the present case, in relation to these three payments, on the ground that Van Slyck intended they should be applied as remittances on account of the tolls of April, May and June, 1825. And they were in fact so applied by the comptroller, in his subse-

quent statement of the amount previous to the trial. The sureties have no right to insist that their principal shall make his payments in any particular way, when there has been no agreement to that effect, except where he attempts to apply them in a different manner, *mala fide*, for the purpose of defrauding his sureties. *Per Best, C. J.*, 10 *J. B. Moore's R.* 371. Besides, it is impossible to ascertain, in this case, out of what monies these payments were made, or when Van Slyck actually converted the public monies to his own purposes. It was unquestionably a violation of his duty, and a technical breach of the condition of his bond, to mix up the public monies with his own, either in a bank or elsewhere, so that they could not be traced and identified. It was not expected by those who then had the direction of the canals and the canal funds, that the collectors would pay over each day's receipts immediately into the treasury ; on the contrary, they may have authorized the collectors to deposit the monies received by them, in some convenient bank for safe keeping until the end of the month, and then to remit the amount to the comptroller with their monthly returns. But if the commissioners or the comptroller had authorized the public monies accruing from tolls to be mixed up with the private funds of the collector, either in a bank or elsewhere, it would have been a gross violation of their duties, and such a breach of a public trust as we have no right to presume any of those officers were guilty of. If the collector was directed to deposit his daily receipts of tolls in a bank for safe keeping, he should have deposited them to a separate account from his own monies, in his name as collector, or in some other way to designate the character of the fund thus deposited ; and then if any loss had happened, by the failure of the bank or otherwise, without his fault, he and his sureties would have been protected. From the testimony of the comptroller, it appears that if the payment of the 30th of May, 1825, was received in a draft upon the bank at Rochester, it must have been taken by a deposit bank at Albany, at its own risk ; and if Van Slyck afterwards applied any of the public monies received for tolls subsequently to the execution of the defendants's bond, to pay the holders of this draft, that of itself was a misappropriation

of the public monies *pro tanto*, and was a breach of the condition of the bond.

The appropriation of the payment of the 5th of June, 1826, cannot be regulated by any of the principles of law on this subject to which I have before referred, as being settled and uniform both in this country and in Europe. At the time of that payment, Van Slyck had been removed from his office, as a public defaulter. There were large balances then due from him, for tolls collected after the first of July, 1825, as well before as after the execution of the third bond; and the amount for which the sureties in each of the two last bonds were liable, exceeded the payment. There were also two small sums then standing upon the comptroller's books, as having been received by the collector for tolls previous to April, 1825, for which the sureties in the first bond were liable, unless some of the payments made subsequent to August in that year should have been applied to satisfy the same. There was no circumstance, therefore, indicating an intention on the part of Van Slyck to have the payment of the 5th of June applied in any particular manner: and as there was no appropriation of the payment by either debtor or creditor, at the time it was made, we must resort to some other rules than those before referred to, for the purpose of ascertaining how this payment should be applied.

In cases not coming within the four preceding rules, which are uniform every where, the laws of no two states or countries appear to agree with each other in all respects; and in many cases there are numerous conflicting decisions and opinions, even in the same state or kingdom. Thus, in most countries where the civil law prevails, it is settled that if neither debtor or creditor makes the appropriation when the payment is made, neither, without the consent of the other, can afterwards elect as to the manner in which the payment shall be applied; but in such cases the law or the court applies the payment upon certain fixed principles of imputation, although these rules of imputation are different in different countries. And yet in Scotland, where the civil law also prevails, this general principle is departed from, and the creditor, after an indefinite payment has been received by him generally, may

ascribe it to which debt he pleases, subject to certain specifi-
ed restrictions.

The Roman law proceeded upon the erroneous principle, that where there were an indefinite payment, the creditor was bound to act upon the golden rule of doing as he would be done by, if he was himself the debtor; and must therefore apply it in that way which would be most beneficial for the debtor. *See* 1 *Donat, b.* 4, *tit.* 1, § 4, *art.* 2, 3. In adopting this principle, the Roman law-givers overlooked the fact that where there were conflicting interests, the golden rule applied to the debtor as well as the creditor; and that, upon the same principle, it would be the duty of the debtor to allow his creditor to apply the payment in the way that he might consider the most beneficial to himself. In other words, that the debtor, as well as the creditor, should be required to do as he would be done by under like circumstances; the effect of which conflicting duties would be, to leave the application to be made according to equity between the parties. And this rule of equity would not require the creditor, where both debts were due and ought to be paid, to apply the payment to that which was secured upon the debtor's property and drawing interest; instead of the one which was insecure, and from which he was deriving no income while he was deprived of the use of his money by the neglect of the debtor to pay both debts. The true principle, unquestionably, is that stated by Chief Justice Marshall in *Field* v. *Holland*, 6 *Cranch*, 27: that the debtor, by neglecting to manifest his intention, or to direct as to the application of a partial payment, tacitly surrenders the right to the creditor, and enables him to apply the payment in such manner as he shall think proper, provided such application is not inequitable; and if the creditor is not in a situation to exercise the right, or if he declines the exercise of the power to make the appropriation, because he has no interest in the question and the rights of third persons only are concerned, the court upon whom the exercise of the power devolves in that case, should make the application upon equitable principles.

In Spain, the principle of the Roman law is followed, in requiring the payment to be applied in that way which is most

ALBANY,
Dec. 1835.

Stone
v.
Seymour.

beneficial to the debtor, where one debt is more onerous than another ; and if that is not the case, the payment is to be applied rateably to each debt. *Inst. of the Law of Spain, b. 2,tit.* 11, *Johnston's Transl.* 186. The laws of France and of Holland are the same, except that where the debts are not of the same dates, and it is equally beneficial to the debtor, the law imputes the payment to the oldest debt. *Code Nap. Art.* 1256. *Van Der Linden's Inst. of Holland, b.* 1, *ch.* 18, § 1, *p.* 267. By the Civil Code of Louisiana, no preference is given on account of priority in date ; but when both debts are not of a like nature, the imputation is made to the *less* burthensome ; and if all things are equal, it is made proportionably. *Civ. Code of Louisiana, Art.* 2162. And by the law of Scotland, as I have before said, the creditor is permitted to make that application which is most beneficial to himself. The rule adopted there appears to have in view the interest of the creditor more than that of the debtor, except that a debt in judgment must be first paid. Also where a third person is a cautioner or surety for one of the debs, the payment is applied pro rata ; the interest of the cautioner counterbalancing that of the creditor. 2 *Bell's Law Dict. art. Indefinite Payment.* But the learned commentator on the Laws of Scotland and of Mercantile Jurisprudence, seems to doubt the correctness of this last rule. He says it requires further consideration, although he refers to two adjudged cases in which it was held that a surety was entitled to have a pro rata application made. 2 *Bell's Com.* 535.

In England and the United States and in Ireland, where the common law prevails, the right of the creditor to make the appropriation to which debt he pleases, is generally admitted, subject to some exceptions ; but the decisions are very much in conflict with each other as to the time within which the creditor must exercise his right of election, and also as to the right itself. The decisions also conflict with each other as to the principles upon which the court is to make the application, where the right is not exercised by the creditor or the debtor. In *Haywood* v. *Lomax,* 1 *Vernon,* 24, Lord Nottingham decided that where an indefinite payment was made by the debtor, it should be applied most beneficially for

him, as in paying off a mortgage drawing interest, instead of an account not secured and on which no interest was payable. This decision has been followed in *Bacon* v. *Brown*, in our sister state of Kentucky. 1 *Bibb's R.* 334. This rule of the civil law, of applying the payment in the way which would be most beneficial for the debtor, was also adopted by Lord Holt, in a case before him in 1697. *Anon, Comb. R.* 463. But in a subsequent case before Lord Cowper, in 1707, it was held that where the payment was general, the application was in the party who received the money, and it was decreed to be applied upon the simple contract debt, which did not draw interest, as being most beneficial for the creditor. *See Manning* v. *Western,* 2 *Vern.* 607, *n.* 1. The principle of this decision was followed by the supreme court of the United States, in *Field* v. *Holland,* 6, *Cranch,* 27, and also by the court of appeals in Kentucky, in *Blanton* v. *Rice,* 5 *Monro's R.* 253, so far as to apply the payment to the debts which were most precarious. But in the last case the court still adhered to the principle of applying the payment to the debt on which the creditor was entitled to interest, instead of that on which none was payable. In *Wilkinson* v. *Sterne,* 9 *Modern,* 427, Lord Hardwicke decided that the debtor must make the application at the time of payment, and that it was too late for him to appropriate it in a particular way afterwards ; that upon a general payment, the creditor might make the appropriation at any time ; and that in the case then before him, if the creditor had been still living, he might have made it, even at that time. In *Baker* v. *Stackpoole,* 9 *Cowen,* 435, Chief Justice Savage recognized the right of the creditor to apply an indefinite payment to any demand he pleased : and also the duty of the court to make the appropriation, if the creditor neglected to do so. But he did not express any opinion as to the time when the creditor's right of election terminated, and the duty of the court commenced. In the case of *The United States* v. *Kirkpatrick,* 9 *Wheaton,* 737, Mr. Justice Story, who delivered the opinion of the court, says, " it is too late for either party to claim a right to make an appropriation of the payment, after the controversy has arisen." In a previous case, however, Ch. J. Marshall, in delivering the opinion of

the same court, held that the creditor having once exercised the right of election, was bound by it; but that until such election was made, the creditor at any time was free to apply the payment either to a bond or to a simple contract, and without intimating that any other restriction existed upon the power of the creditor to make the appropriation at any time he pleased. *The Mayor of Alexandria* v. *Patten*, 4 *Cranch*, 320. The court of appeals in Virginia decided that the creditor was bound to make the appropriation soon after the payment was received. *Hill* v. *Southerland's Executors*, 1 *Wash. R.* 128. In the case of *The United States* v. *Kirkpatrick*, it was held, that in the case of a public officer receiving and paying over public monies, from time to time, the principles relative to a running account between individuals must be applied, even where different sureties were concerned. But in *Lysaght* v. *Walker*, Lord Tenderden, who delivered the opinion of the house of Lords, declared that there was no inflexible rule which necessarily required subsequent payments to be applied in payment of the first items of the account, when different interests were concerned.

Amid these conflicting opinions and contradictory decisions, it will not be strange if we should not be able to find any other rule to govern this anomalous case, and to apply the payment of the 5th of June, than to apply it equitably, having at the same time a due regard to the rights of all concerned. Equality among creditors and sureties is equity; and if there was any reason for supposing that this payment was made out of the monies received for tolls during the boating season of 1825, as well as in the spring of 1826, or that it was the collector's own money, the equitable rule would be, to appropriate it rateably between the three bonds, so as to give to the sureties in each bond the benefit of the payment, in proportion to the amounts for which they were severally holden. But if the payment was made out of the monies received for tolls in the spring of 1826, all of which, except $557,90, was received after the sureties in the third bond became answerable for the faithful appropriation of the money collected by Van Slyck, it would not be equitable to apply any of the proceeds of those tolls to relieve the sureties in the first and sec-

ond bonds, from their liabilities for the tolls of the previous year, which had been wasted or misapplied. If the debtor himself had manifested such an intention at the time the payment was made, it might have determined the rights of the parties, although it was not such an appropriation as the court would make, unless the sureties in the last bond could satisfy the court that such appropriation by the debtor was not made in good faith. At the time of this payment, in June, 1826, Van Slyck had in his hands about $11,000 of tolls, which he had received in April and May of that year. It cannot, therefore, be presumed that he made the payment out of his own money, without proving any fact from which such a presumption could arise ; and as he had then been removed from office, he had then no inducement to apply the payment to one part of his indebtedness in preference to another.

The result of my examination is, that if indefinite payments are made, on account of public monies received, and the monies are placed in a general account, by the officers of the treasury or the comptroller, from time to time, without any specific appropriation thereof, and the accounts have not been stated and settled after the receipt of such payment, and where no intention was manifested by the debtor as to the application of the money, such general payments are not necessary to be applied to the first items of charge on the debit side of the account ; but they may be thereafter appropriated according to equity ; and that in making such an equitable appropriation in the present case, if any error has occurred, it was in not crediting the $410,04, part of the payment of the 5th of June, to the third bond, instead of deducting it from the amount for which the sureties in the second bond were holden. As the defendants in the court below had it in their power, by the production of the books in their hands, or in the hands of one of them, to show out of what funds this payment was made, I am inclined to think the $410,04 should not have been allowed without some further proof or explanation ; but as the plaintiffs in error cannot complain of this error in their favor, the judgment of the supreme court should be affirmed.

By Senator MAISON. At the time of the giving of the bond now in suit, Van Slyck was largely indebted to the treasury for tolls which he had collected and had not paid over. A portion of the toll monies collected by Van Slyck, after the liabilities of the parties had commenced upon the bond in controversy, has been applied, or is claimed to be applied, to make good his previous defalcations. It does not appear that Van Slyck ever directed any specific appropriation of the tolls by him received on or after the 1st June, 1825. And any intention of appropriation to the injury of his sureties is not to be inferred. Nor does it appear that the comptroller made any specific appropriation thereof; he gave Van Slyck a credit on his general account, for all the monies he paid, on the books in the comptroller's office, and the comptroller cannot be allowed to make any appropriation specifically, after a controversy has arisen in relation to it. Nay, so far from there having been any appropriation made of these monies, the comptroller expressly testifies, that there was no specific appropriation made of them, either by himself or Van Slyck.

Van Slyck did, in the months of June and July, literally and strictly comply with the very letter and spirit of his bond, by paying into the treasury all monies during those months, received as collector; yet has the sum of $1093,64 of tolls collected on the 1st of June been in effect applied, in relief of the sureties in the former bond, to the part payment of an arrearage due from Van Slyck to the treasury, anterior to the time of the giving the bond in controversy; and to that amount is Van Slyck made a defaulter under the new bond, and the jury, under the directions of the circuit judge, have, in effect, found that the sureties of the bond in suit must respond to the treasury in that amount. I say this amount has in effect been applied as suggested. The credit of May 30, of $9936,-63, was made by a check or draft upon the Rochester bank; the cashier of that bank testifies, that that check or draft was not presented or paid at the bank until the 4th of June; that on the 30th May, Van Slyck had not cash enough in the bank to meet that draft; that nearly all the deposit of $1100 of tolls made on the 1st of June, being required to make good that draft, and out of which monies the draft was paid. The mon-

ey in deposit up to the 1st of June was $8,842,99, which was short of the amount of the draft by $1093,64 before mentioned. This amount, therefore, which should have been credited to the defendants on their bond, has gone to pay in part a defalcation which existed before the giving the bond in question. Not only the tolls collected on the first day of June, but the tolls collected on every day of that month have gone in the same way, in relief of the parties of the first bond. I cannot assent to such manifestly unjust and illegal diversion, and inequitable appropriation of these monies, to the injury of the sureties in the bond in suit.

I have before remarked, that the testimony shows, that neither Van Slyck nor the comptroller made any appropriation of the monies collected by Van Slyck on and after the 1st of June; both having omitted it, " the law," says Mr. Justice Story, in the case of *The U. States* v. *Kirkpatrick*, 9 *Wheaton*, 737, " will apply the payments according to its own notions of justice." I think I am safe in asserting that no law can be found declaring it to be just, that the sureties in this case should be made liable at all for monies collected by Van Slyck, their principal, during the months of June and July, which have been by him in truth and in fact paid into the treasury; but which, from the manner of the keeping the accounts at the office, have gone to the discharge of delinquencies for which other sureties are responsible. I admit that Van Slyck could make such an application and appropriation of the monies as he pleased; they were under his power and control; he might have converted them to his own use, if he had seen fit to do so; it was to coerce an honest discharge of his duty in paying the toll monies into the treasury, that sureties are taken; but I deny that the comptroller has any right, in law or equity, to make an application of the monies collected and paid by Van Slyck during the life of this bond, to the discharge of a debt due from Van Slyck to the treasury, which accrued during the life of another bond, and for which competent sureties have, or should have been taken. It would be gross injustice to compel a man, whether he would or no, to pay the debt of another, which he never agreed, undertook or promised to pay, and is under no legal or equitable, or moral or honorable

obligation to pay.   If this judgment is suffered to stand, that will be the precise effect in this case.   Upon the assumption that Van Slyck is insolvent, the sureties in this case are, by this judgment, made to pay a debt which is due from the sureties in the first bond.   Such a judgment, the law, according to its own notions of justice, could never render against any man. The case of *The U. States* v. *January and Patterson,* 7 *Cranch,* 574, is very much like the case under consideration. The supervisor of the revenue appointed Arthur a collector ; he, in August, 1797, executed a bond with the defendants as his sureties to the United States, with a condition, that he would faithfully perform the duties of collector.  In March, 1799, he was reappointed, and then gave one R. Patterson his surety in a new bond.   The supervisor kept one general account with the collector ; there was a balance against the collector when he gave the second bond of $6,483,59.   Proof was offered to show, that the supervisor had said that the collector had paid a sufficient sum to discharge the bond first given, and that which he had paid should be so applied.   The circuit court instructed the jury, that if they believed the supervisor had made the election and promise as proved, it was a declaration of his election how the payments made by Arthur should be applied, and that whether a formal entry in the books of their appropriation, corresponding with that election, were made or not, was immaterial, and that the jury ought to consider the application as made.   The attorney for the United States excepted to this opinion.   The supreme court of the United States declared that opinion erroneous, and reversed the judgment rendered on the verdict.   Duval, justice, in delivering the opinion of the court, said, the law with respect to the application of particular payments, where the debtor owes distinct debts, has long since been settled ; the debtor has the option, if he thinks fit to exercise it, and may direct the application of any particular payment at the time of making it.   If he neglects to make the application, the creditor may make it ; if he also neglects to apply the payment, the law will make the application.   In this case, continues the judge, a majority of the court is of opinion that the rule adopted in ordinary cases is not applicable to a case

circumstanced as this is—where the receiver is a public offi-
cer, not interested in the event of the suit, and who receives
on account of the United States, where the payments are in-
discriminately made, and where different sureties under dis-
tinct obligations, are interested.   It will be generally admit-
ted, that monies arising, due and collected, subsequently to
the execution of the second bond, cannot be applied to the
discharge of the first bond, without manifest injury to the sure-
ty in the second bond ; and vice versa, justice between the
different sureties can only be done by reference to the collect-
or's books, &c.   The principle settled by the supreme court
in that case, should have a controlling application in this.   It
is a sound moral as well as legal and equitable principle, and
if it be allowed its proper influence in the decision of this cause,
the judgment given recognizing a distinct contrary principle,
should be reversed.   The court below has, however, recog-
nized and adopted this principle of the supreme court of the
United States to its full extent, in relation to the payment of
the 5th June, 1826.   At the closing of the account they say
expressly, that the defendants are entitled to be credited for so
much of the amount paid by Van Slyck on the 5th June, as
can be shown to have been received by him for tolls prior to
the 14th April, 1826, when new sureties were given.   And
why the same principle should not have been applied at the
commencement of the account, I am at a loss to conceive.

It appears to me that justice and equity concur in declaring
that all the toll monies collected by Van Slyck during the life
of this bond, and which had been paid by him over to the
treasury, should be credited to those defendants ; and they
cannot, in judgment of law, be deemed responsible, only for
those monies collected during the life of this bond, and not
paid over pursuant to its conditions.   As the judgment in this
case has not been rendered in accordance with this rule, I
am for reversing it.

By Senator TRACY.   The main principle involved in this
case is that of the appropriation of payments, and the deter-
mination of it depends essentially on the manner in which the
account for the monies received for tolls should be arrang-

ed, whether as an account between the collector and the state, or as one between the state and the several sets of sureties. The plaintiffs in error complain, and with some show of reason, that the supreme court has treated the account, in both these aspects, so as to deprive them of the benefit of credits to which they would have been entitled if either of the two modes of arranging the account had been adhered to. This error, if it exists, has proceeded, I have no doubt, from an effort on the part both of the court and the financial offiers of the state, to do what they supposed equal justice to all parties interested in the subject, whether they were parties to the suit or not. But it is our business to confine our decision to the legal rights of the parties as they appear before us, without anticipating contingent questions of equity that may hereafter arise.

That the comptroller did always treat the account as one between the state and the collector, and not as one between the state and the several sets of sureties, is a fact about which there is no room for dispute. The copy of the account returned with the bill of exceptions shows it; and the comptroller testifies, " that in keeping the account he had no reference to the different sureties of the collector;" that the charges were made against the collector for monies received, according to the returns furnished by him, and all payments credited in general account, as and when received. That this was the proper and legal mode of keeping the account is, I think, equally plain. The collector received his appointment from the canal commissioners under the general powers confided to them by the laws of 1817 and 1820. These laws prescribed nothing as to the form or duration of his appointment, or the security he should give for the faithful performance of his duties : all was left to the discretion of the commissioners. By the law of 1820, p. 189, §20, they were authorized to make all needful rules and regulations in respect to the collection of tolls and the payment thereof to the commissioners of the canal fund. Under this authority, they appointed collectors, and adopted a regulation requiring fresh security at stated periods. There is nothing in the case to justify the opinion that the taking of fresh security was a dis-

charge of the former security, or that it should be regarded otherwise than cumulative security. This is a fact which materially distinguishes this case from *The U. States* v. *January and Patterson,* 7 *Cranch,* 572, where the second bond was given on a renewal of the commission or second appointment to the office. Here there appears but one appointment and a continuous, unbroken responsibility from the officer to the state. This responsibility no way depended on the security given, but resulted from the fact and nature of the trusts confided to him, and would be the same whether he had or had not given pledges for the faithful execution of those trusts. The tenure of his office was the pleasure of the commissioners, and they could at any time exact additional security under the penalty of a revocation of his appointment. With the taking or existence of this security, the comptroller had no concern, nor was he necessarily acquainted with the fact that security was taken ; for it was wholly the business of the commissioners, in whose names, or the names of some of them, the security was received. Under such circumstances, there could be no other proper or practicable way for keeping the account, but as one between the collector and the state. This was the mode sanctioned in the case of the *Post Master General* v.*Furber,*4 *Mason,* 333, where the reasons for it were less forcible than here ; for there the different securities were required and received by the party keeping the account.

The inquiry then occurs as to the appropriations to be made of payment on such an account. The whole law on the subject of the application, or as it is sometimes called, the imputation of payments, was learnedly discussed and fully expounded in Clayton's case, *Devaynes* v. *Noble,* 1 *Merivale,* 572 ; and the rules there settled are, 1. Where there are several debts or liabilities, the debtor has the power to direct to which the payment shall apply ; 2. If the debtor does not make the direction, the creditor may elect how to apply it ; 3. If there is but one general account and no specific direction, the payments shall apply to extinguish the indebtedness in the order of its time, or *pro tanto.* The question which has given birth to most of the English cases on the subject, and occasioned decisions not very reconcilable with each other,

does not arise, I think, in the present case; certainly not, if the rights between the different sureties are kept out of view, as they should be in arranging the account as one strictly between the principal and the state. But still a brief reference to this question may aid to illustrate the point of the present controversy.

The rule of the civil law is, that if the creditor, from the failure of the debtor to direct the appropriation of the payment, obtains the right to make it; he must exercise the right when the payment is made, and testify his election by an acquittance or some other sufficient evidence to the debtor. But if he fail to do so, his right of election is gone, and the law applied the payment most beneficially for the debtor in the extinguishment of that portion of his indebtedness which was most burthensome to him—as of a debt bearing interest in preference to one that did not—of one secured by a penalty rather than of one resting on a simple stipulation; and if the debts were equal, then to the oldest. This is on the presumable intention of the debtor to make the best use he could of his money, and which intention the law would execute, though the debtor failed to declare it. But the course of the English decisions and of some in this country has been rather to reverse this rule of the civil law, by presuming for the creditor, in the absence of any express appropriation by either party, the benefit of an intention to apply the payment most to his advantage, at least to extend the time to him for testifying his election. The cases of *Goddard* v. *Cox*, 2 *Strange*, 1194, *Newmarch* v. *Clay*, 14 *East*, 239, *Peters* v. *Anderson*, 5 *Taunt.* 596, are of this tendency; and so also is to be regarded the opinion of Chief Justice Marshall in the *Mayor, &c. of Alexandria* v. *Patten*, 4 *Cranch*, 317, where he says, " no principle is recollected which obliges the creditor to make the election of appropriation immediately." But the direction of the decisions has not been uniform; for the cases of *Maggot* v. *Mills*, *Ld. Raym.* 287, *Dowe* v. *Holdsworth*, *Peake's N. P.* 64, *Robert* v. *Garnie*, 3 *Caines*, 14, are in support of the civil law rule, denying to the creditor the advantage of an *ex post facto* election. And the point is still so much unsettled, that the master of the rolls avoided passing upon it in Clayton's case, say-

ing that he should feel a good deal embarrassed if the general question of the creditor's right to make the application of indefinite payments had then to be determined. Probably it will most conduce to justice between debtors and creditors that the rule should not be absolute either way, for cases are continually occurring where an inflexible application of it would be inconsistent with equity and reason. As the principle now stands, the courts, in the absence of a distinct appropriation of either party, will impute the payment with a regard to the probable disposition that would have been made by the parties at the time, to be collected from all the circumstances of the transaction. But the discretion which courts assume in this respect, is restricted in cases of payment on a single running account between the same parties, where there has been a uniform adherence to the civil law rule, that of imputing the payments to the prior indebtedness, extinguishing it *pro tanto* in its order of date. The rule has even been extended to cases where the account was not strictly between the same parties, as was the fact in Clayton's case, and in *Bodenham* v. *Purchis*, 2 *Barn. & Ald.* 39, where the creditor having blended an account between different persons, the payments were held to apply *pro tanto*, though the creditor lost thereby security for part. Also, in *Kirby* v. *Duke of Marlborough*, 2 *Maul. & Sel.* 18, where the creditor was allowed the advantage of general payments in preference to the defendant, who was a security for the latter portion of the indebtedness, on the principle that the payments were made generally on an open account between the creditor and the debtor. And much the same was ruled in *The U. S.* v. *Kirkpatrick*, 9 *Wheat.* 720, where, though sureties were interested in a particular appropriation, the court decided, that it being a running account between the government and the collector, unbroken, except where balances were adjusted for the purpose of making rests, the payments should be applied to extinguish the debt according to the priority of time, so that credits are to be deemed payments *pro tanto* of the debts antecedently due. The last case is scarcely distinguishable from the present one ; and, indeed, the court below adopt it as analogous, and make it a

Vol. XV. 6

ALBANY,
Dec. 1835.

Stone
v.
Seymour.

ALBANY,
Dec. 1835.

Stone
v.
Seymour.

controlling authority for refusing the defendants the benefit of the payments which Van Slyck made in July, after the defendants became his sureties, although it was pretty evident that this payment was made entirely from monies collected after their liability commenced.   And it is on this principle alone, that this refusal can stand ; for if the court had disregarded the rule in the same degree in reference to this payment, that it did in reference to the last payment which Van Slyck made, it could not have sustained the charge of the circuit judge, that the jury might infer the intention of Van Slyck from the circumstances, and if they believed he intended its application to the May tolls, they should not allow it in the present suit.   This position was erroneous, because the testimony of the comptroller is positive that Van Slyck never gave to him any intimation whatever for a specific appropriation of the payment, and that *he* in fact never made any, but credited it generally, without regard, and probably without knowledge of the coincidences which are relied on afterwards for establishing an intention in Van Slyck of making a specific appropriation of it ; an appropriation, it may be here observed, which he could not have produced in fact, had he distinctly directed it.   If, therefore, this part of the case were to be disposed of in regard to the principle advanced by the court in the other part of it, that where there are different sets of sureties, each should have the benefit of the amount actually received by his principal during the period of his suretyship, there would be no doubt that the charge of the judge was erroneous ; inasmuch as it took from the jury the inquiry whether the payment in July was of money received by Van Slyck after the defendants became sureties.   But if the principle adopted in fact by the comptroller, of applying the payments generally, is correct, then the direction of the circuit judge was immaterial, and the verdict in this respect proper. But from these premises it follows, necessarily, that the payments made in April and June, 1826, should be appropriated on the same principle, and that the supreme court has erred in attempting to set up another rule for their government, in conflict with the rule they had just applied to the payment in July, 1825.   The distinction between the sureties is put on

the authority of *The U. S.* v. *January and Patterson,* before referred to, but where, as I have already noticed, the facts are not analogous. But if they were, the authority should be as good at one end of this case as at the other, and if the supreme court had made the same application of it to the first payment as to the last, it would have had to reverse the decision of the circuit judge. But that case is a rule only for itself. There is no principle to be gathered from it in respect to the right of sureties to control appropriations of general payments on a running account between the principal and the creditor. Mr. Justice Story, speaking of it in *Postmaster General* v. *Furber,* 4 *Mason,* 335, says he does not understand it as inculcating a different doctrine than that where there is no specific appropriation by either party, the sums paid by the principal shall be applied to extinguish the indebtedness in order of time, without regard to any change of sureties that may have occurred. But he admits what all must who read it carefully, that " it is somewhat difficult from the facts of the case as reported, to give a very definite interpretation of the opinion of the court." This last case, *Postmaster General* v. *Furber,* is, in its circumstances, much like the present. It was an action against a deputy postmaster and his sureties, where there had been two bonds given, and where the sureties on the second bond sought to have the payments, made after its execution, applied for their benefit rather than to a prior indebtedness existing at the time they became sureties. But the court decided that in the absence of any distinct appropriation, the rule was the same, whether the case respects a principal or a surety ; for the rule supposed that when payments were made generally, and applied to extinguish the indebtedness of the principal in order of time, they necessarily extinguished the indebtedness of the sureties in the same order. I have no doubt that this mode of appropriating general payments is sanctioned by authority and by policy, especially in cases of public officers, where fresh security given for the performance of the same duties under the same appointment should be deemed merely cumulative. It is unnecessary now to discuss the rights of the sureties to contribution between themselves, for the question does not arise ; but so far as there is a concurrent

liability, their rights would of course be governed by the common rules applicable to co-sureties.   To conclude, I am of opinion that the supreme court erred in excluding from the principle of a general credit the payments made by Van Slyck in April and June, 1826, and therefore the judgment should be reversed.

On the question being put, *Shall this judgment be reversed?* the members of the court voted as follows :

*In the affirmative*—Senators Fox, GRIFFIN, LACEY, MAISON, SEGER, TRACY—6.

*In the negative*—The CHANCELLOR and *Senators* ARMSTRONG, BEARDSLEY, BECKWITH, BISHOP, EDMONDS, FISK, HALSEY, LAWYER, MACDONALD, M'DOWELL, WILLES, YOUNG —13.

Whereupon the judgment of the supreme court was AFFIRMED.