# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

## Logan *against* Mason.

6 WS
217   511

The provision of the Roman law, which, in the application of a payment, requires the creditor, when the right has devolved on him by the laches of the debtor, to consult the debtor's interest in preference to his own, has not been adopted as a part of the common law; and the propriety of an instant and actual application, by a creditor firm, of the proceeds of a separate note transferred to it generally as collateral security, without specifying for what debt, by a partner indebted to it on joint and separate account, cannot be questioned.

ERROR to the District Court of *Allegheny* county.

John T. Logan and Robert T. Kennedy, trading under the firm of Logan & Kennedy, against Washington Mason and William Dilworth, trading under the firm of Mason & Dilworth. It appeared by a case stated that the defendants, Mason & Dilworth, were indebted, at the dissolution of their partnership, on the 27th June 1839, to the plaintiffs, Logan & Kennedy, who held their bills and notes for about $2000. Mason, who continued the business, and Owens, his surety, contracted with Dilworth, who retired, to pay the partnership debts. Mason continued to deal with the plaintiffs, on his own account, till the 4th December 1839, when he was indebted to them, including a small bill he owed

VI. — 2                                                    (9)

[Logan v. Mason.]

them at the dissolution of the partnership, in the sum of $259.79. On the 25th November 1839 he transferred to them a note drawn in his favour by Johnson, which was no part of the joint effects, for $550, as collateral security, without specifying for what debt. He made a general assignment on the 19th January 1840, preferring Owens as his surety, and was discharged as an insolvent debtor on the 23d March 1840. On the 13th May 1840, Logan & Kennedy applied the proceeds of the note, by an entry on their books, to the debt due from Mason on separate account in the first place; and the residue to the debt due by Mason & Dilworth. Owens subsequently paid the plaintiffs all the partnership debt except the part of it which he insisted ought to have been satisfied out of the proceeds of the note; and it was agreed, if the court should be of opinion that the plaintiffs had a right to apply the proceeds of the note to Mason's separate debt, in the first instance, judgment should be rendered in their favour for the $259.79; otherwise for the defendants. The District Court gave judgment for the defendants, and the record was removed to this court by writ of error.

*M'Candless*, for the plaintiffs, cited 1 *Wash. (Virg.) Rep.* 133; 4 *Cra.* 320; 9 *Wheat.* 724; 29 *Engl. C. L. R.* 25; 30 *Ibid.* 286; 35 *Ibid.* 78; 2 *Hall* 197; 4 *Gill. & J.* 372.

*Eyster*, for the defendants, relied on *Harker* v. *Conrad*, (12 *Serg. & Rawle* 301); *Gass* v. *Stinson*, (3 *Sumner's Rep.* 110); and the *American Lawyer's Magazine*, No. 1, art. 2.

The opinion of the Court was delivered by

GIBSON, C. J. — If anything has been settled by decision, it is that the right to apply a payment without restriction as to anything but the time, devolves on the creditor in default of application by the debtor; and I feel myself so bound by it, that were I ever so well convinced of the superior excellence of the civil law, I could not adopt it. I know not how an English or an American judge can strip an adopted rule of its common law emendations merely because they were originally no part of it. It has become the law of his court, not by virtue of any inherent obligation in it, but by the force of precedent; and the same force that was competent to adopt it, was equally competent to establish the parts that were added to it. If the courts were to discard them now, the law of contracts, of testaments, of donations *causâ mortis*, of guardian and ward, and, in short, of the whole mass of moveable property, would be thrown into hopeless confusion by it, followed by instability of decision—the worst curse that can befall a people. Notwithstanding the admitted excellence of the Latin code, the English Judges were constrained to alter almost every part of it which they introduced into the body of the common law, in order

[Logan v. Mason.]

to fit it to modern use; and the continental states who profess to have received it entire, followed, only to a less extent, the footsteps of their more commercial neighbours. These alterations were indispensable to make the jurisprudence of the day keep pace with the changes wrought in the affairs of men by the lapse of a thousand years. Yet, encouraged by an article in the *Lawyer's Magazine*, (*No.* 1, *art.* 2), and by the authority of Mr. Justice STORY, in *Gass* v. *Stinson*, (3 *Sumner's R.* 110), the District Court have disregarded an actual application by the creditor in due season, though there had been no application by the debtor. For everything that comes from Mr. Justice STORY, I feel a deferential respect; and had not the weight of his name been thrown into the scale, I should not have felt myself called on to vindicate the rule of the common law. But in saying that as regards the application of payments, the Roman law is more rational and consonant to the presumed intention of the parties, than the common law; that it is equally simple and convenient; and that it is, or ought to be, the law of the subject in this country; it seems to me, his partiality for his favourite code has carried him too far. In the American courts, the question is not an open one; and it would require some intolerable mischief—certainly more than an equality in point of simplicity, convenience and reasonableness—to justify us in overturning the decisions of more than two centuries. Were we called on to engraft a new principle on the common law stock, without lopping a branch to make room for it, I would certainly do as Lord MANSFIELD did, in laying the foundations of the English commercial law—I would take it from what he, perhaps justly, called the first collection of written reason that ever existed. Its fault, if it has one, is in aiming to do too much, by attempting to give effect to abstract equities which are too subtile to be dealt with by a human tribunal; at least by one encumbered with a jury. There is, however, no such equity in the case before us.

It is agreed that the application of a payment belongs to the debtor in the first instance; and that, in default of application by him, it devolves on the creditor. So far the Roman law and the common law march together. But the Roman law has this extraordinary proviso, that the creditor make the application as he would make it if he were the debtor; and any other application by him would go for nothing, on the ground that his act is consonant to the presumptive wish of the parties only, when it is most beneficial to him who paid. It is scarce necessary to say how unfounded is such a presumption, in experience, which is the mother of presumptions. It certainly is a narrow basis for a moral duty. Why should the creditor, standing in no relation of confidence, be expected to take care of the interest of a party who is too supine or indifferent to take care of it himself? Conscience has nothing to do with such a case; for the man who will not exercise his right at the proper time, renounces it. This princi-

[Logan v. Mason.]

ple is the foundation of many of our titles. When the land of an intestate has been divided by partition in the Orphan's Court, the children have priority of choice between the purparties in the order of their seigniority and sex; but when the oldest son neglects to choose, his priority passes to the next in order, who is not bound to consult any particular interest in the use of it. No lawyer ever dreamt that an elder son, who had slipped his time, might recover from his younger brother on the ground that his interest had not been sufficiently cared for. Such a pretension would be met with ridicule. It may be said that this is a judicial proceeding. But if the owner of an earlier descriptive land-warrant, who has a right to have it satisfied out of the best part of the vacant land, omit to exercise it by having his survey made in due time, he will pass his priority to the owner of the later warrant, who may then choose for himself without jeoparding his title. And this is a proceeding *in pais.* It will not do to say that this is a principle of local and peculiar law. I know not a more beautiful system, nor one more founded on principles of general equity, than the land-laws of Pennsylvania. Why should there be a difference, in this respect, between the appropriation of land to a particular warrant, and the appropriation of money to a particular debt? A right of choice is essentially exclusive; and if the creditor's right of application is to be controlled by the interest of the debtor, it is no right at all. The exercise of the power devolves on the creditor either as a right or as a duty. If as a right, it is absurd to say he may exercise it, but only in subordination to the right of another. Yet the Roman law says so, and tacitly admits that its proviso is repugnant to its rule. The writer who champions it in the magazine, goes further, and admits that the proviso seems to be expressed in mockery of the creditor. If, however, the power devolved on the creditor subject to a duty to make the application in a particular way, he might be compelled to exercise it. But why compel him to go through the form of an application which the law would make without his assistance? That would be a mockery indeed. The well-founded remark of the chancellor of New York, in *Stone* v. *Seymour,* (15 *Wend.* 29), shows clearly the want of a moral obligation, in this matter, which the Roman law would enforce as a moral duty. As a rule of morals, the golden precept, to do as we would be done by, ought to bind the debtor as it binds the creditor; yet it is not assumed by that law that the debtor, when he makes the application, is bound to consult the interest of the creditor; though it is a maxim of our law that equality is equity. But, says the writer in the magazine, this is a mixing up of things quite distinct from each other; for the maxim, thus commented on, of a code drawn from a remote period of paganism, does not aspire to the golden rule inculcated by our Saviour. To what, then, does it really aspire, that we should be bound to displace the decisions of two hundred years to

[Logan v. Mason.]

make way for it? The morality of the New Testament is for all times; and that the maxim cannot endure a test so severe, is proof as strong as holy writ, that there is something wrong in it. And if it be not founded in moral duty, whence comes its obligation? The writer himself claims no such foundation for it, but places it on the pedestal of a sentiment for the poor debtor. The sentiment, however, would be ill bestowed on the debtors of our day; for the poor man is not so often in debt as the rich one, by reason that he cannot so readily get credit. The capitalists are the luxurious consumers, the great purchasers, the great traders, the great manufacturers, the great borrowers, and consequently the great debtors. Nor does sympathy for the poor give tone, as the writer supposes, to either our legislation or our jurisprudence. In no country is the power of wealth more oppressively exerted than in our own. Witness our unequal taxation, which favours the land-holders and casts the public burthens on the feeble and defenceless, who have no refuge from power, but complaint; and witness stay-laws and relief-laws passed avowedly for the protection of property. Witness, too, the impunity granted to banking companies. The really poor debtor has no need of these. He has no land, no complicated dealings to involve him in debts on distinct accounts; makes no payments, and is indifferent to priorities of application. His refuge is the Insolvent Law, which makes his creditor his slave. As respects jurisprudence, I am proud to say, the bench has not disgraced itself by forgetting the scriptural precept: "Ye shall do no unrighteousness in judgment; thou shalt not respect the person of the poor, nor honour the person of the mighty." (Leviticus, ch. xix., v. 15.) The proviso of the Roman law, then, has not even this same antiscriptural sentiment to give colour to it; and the only thing else which the writer seems to claim for it, is that it is not altogether impracticable. The seductive facility of application, which he charges against the rule of the common law as a defect, might perhaps be placed to the other side of the account. But the true cause that there is priority of application at all, is not the supposed merit or misfortune of the party, but necessity. It must be vested somewhere; and the common law vests it in the debtor, because, in the transaction of payment, he takes the first step. If election is given of several things, says Lord Coke, (1 *Inst.* 144), he shall have it who is the first agent, and ought to do the first act. If, as I conjecture, the rule of the Roman law has the same origin, its supposed sentiment is no better founded than its morality.

The rule of the common law seems better founded in both reason and convenience. Its facility of application is a great, and an original praise. Who can tell how a debtor would have his payment applied? Not the debtor himself, if his interest were so balanced as to make him indifferent to the event; and if it were not, he would take care to give the proper direction at the proper

time. How could the creditor decide for him, if he could not, or would not, decide for himself? He might call on the debtor for instructions; but then the application might happen not to be the act of the creditor, except as the debtor's puppet; and the creditor's privilege would thus be deceptive. Though he should have acted in good faith, yet if the Judge should think he had erred in his belief that the particular application was the best thing that could be done for the debtor, it would go for nothing. It is plain, therefore, that the right of application held out to the creditor by the Roman law, is illusive. It is a solecism to call it a right, if it is not an independent one. And when the Judge would come to correct the creditor's error, he would be bewildered with the same distracting considerations that misled the creditor in the first instance, and that would have led to the conflict of decision in the English and American courts, complained of by the writer, where there was no actual application by either party. But nothing is more easy than to determine whether there was an application in fact when the money was received. There has doubtless been inconsistency of decision in regard to the period allowed for the creditor's election; but the inconvenience from it will not be a durable one. The reasonableness of notice to the drawer of a bill or the endorser of a note, was for a time determinable by no definite rule; yet it is now susceptible of legal certainty; and it would be just as easy to find a rule for the time of application. The case before us stands clear of difficulty on that head, and I pretend not to lay down such a rule authoritatively; but I take it that the entry or memorandum of the application ought to be of a date so early as to raise a presumption that the act of application was simultaneous with the act of reception, and not the consequence of an after-thought. It seems to be the better opinion that an application by either debtor or creditor must be part of the *res gesta*, the difficulty being to fix the point of time beyond which the entry or memorandum of it shall not be delayed. It would seem reasonable to put it on the footing of a charge in a book of original entries, which must appear in its place among the transactions of the day, and to have been made the same evening or the day following. Such a rule would be certain to a convenient extent. But notwithstanding the admitted discrepancy of the decisions in regard to time, it would occasion more discrepancy to refer the propriety of an actual application to the law.

When the debtor, in this case, assigned the note to the defendants as collateral security, he was silent as to the application of the proceeds of it; and if he desired to have it placed to a particular account, it was his business to say so at or before the time when the money was received. The creditor firm applied it at the moment, and the case is unembarrassed by any consideration of the time; so that we have before us the naked question, whether an application by a creditor can be opened to let in the equity of

[Logan v. Mason.]

a surety, or the presumptive intention of the debtor.   In *Harker* v. *Conrad*, (12 *Serg. & Rawle* 305), cited for the affirmative, there was no such application; and the remarks of the court were predicated of a very different case.   Were there not an actual application in the case for decision, I certainly would not contest the positions of the District Court.   The equity of a surety may enter into an open case as it enters into a case of substitution, in which it is treated as a matter resting in mere benevolence, but not suffered to affect the legal right of a third person.   But actual application at the proper time, gives a legal right, and the equity of a surety shall ·not disturb it.

The case of *Dickinson College* v. *Church*, (1 *Watts & Serg.* 464), which has been mixed up with the discussion, has been wonderfully misunderstood.   The question was whether there had been evidence, to be left to the jury, of an actual appropriation to a previous account, in order to entitle the plaintiff to retract a credit given on the face of the claim filed as the groundwork of the lien.   The defendant prayed direction that " the payment of $400 having been credited on the account of materials furnished for said building, the price of which was a lien thereon, could not be withdrawn and applied (to an account for materials furnished) to another building." It is known that these prayers are frequently founded on the assumption of facts contested and sometimes unsupported by evidence; and the doubt was whether the question of previous and inconsistent appropriation was raised by the evidence at all.   The court thought it was, and left it to the jury " to determine whether it *was* [to be] so applied."   Now, retain the words in brackets, and the sentence is unintelligible; expunge them, and the meaning is clear.   Their insertion was probably occasioned by a blunder of the person who copied the record, in making up the paper-book; and they passed through the press without correction, no doubt, because the reporter in the country who made up the case, committed the correction of the proof-sheets to his colleague in town, less familiar· with the details of it.   The Judge who delivered the opinion of the court, when the cause was here on a writ of error, disposed of the point by saying, that though the testimony ought to be scanned with great severity, there was no error in leaving the fact to the jury; and though the point is obscurely stated, it might readily have been· perceived that it was the fact, and not the law, which had been thus left.   The truth is, the point was raised by one of those exceptions which are habitually thrown in as make-weights, to multiply the chances of reversal; and it was so obviously untenable, that it was faintly pressed at the argument. The decision was not intended to be a precedent for anything out of the case ; and that the point was noticed at all, was because there is a statute which .requires us to decide every exception taken below, and because the matter was to go to another jury. The reporter did not expunge it, I presume, because he did not

[Logan v. Mason.]

consider himself at liberty to mutilate an opinion of the court. This explanation, it is hoped, will prevent the case from being misunderstood in time to come.

Judgment for the defendants reversed; and judgment on the case stated, for the plaintiffs.