THE MARTHA.

KINKEL v. THE MARTHA, etc.

(*District Court, S. D. New York.* January 17, 1887.)

1. PAYMENTS—APPLICATION OF—BOTTOMRY BOND — GENERAL ACCOUNT — SHIP'S AGENTS—NECESSARY ADVANCES—MASTER'S DRAFT DISCOUNTED.
   . Payments by the debtor will be applied according to the intent of the parties, where that can be determined with reasonable certainty.[1]

2. SAME—CASE STATED.
   The steamer M., belonging to the Stettin-Lloyd line, having arrived in New York, subject to a bottomry bond, S., the owner of the line, being in embarrassed circumstances, engaged W. & Co. to act as resident agents of the line in New York, provided they would arrange to take up and hold the bottomry bond, to which W. & Co. agreed; having first arranged that the master of the M. should draw upon S. for £1,700 in favor of W. & Co. payable in Germany, four days after the M.'s arrival there, which draft was to be discounted for W. & Co.'s benefit. A draft was drawn by W. & Co. also in order to procure the discount, and the next day W. & Co. took up the bottomry bond, advancing therefor about $5,000, the excess over the moneys received upon the draft. The proceeds of the draft were put by W. & Co. to the credit of S. in their "general account." A different special account was kept, as respects the bottomry. W. & Co. soon after made large advances in fitting out the vessel, and accepted various accommodation drafts for S. in the current business. *Held,* upon the circumstances and conflicting evidence, that the draft was designed to aid W. & Co., both in taking the assignment of the bottomry bond and also in making their necessary advances in fitting out the ships of the line for their voyages from this port; that it was designed to be applied, first, against these necessary advances and liabilities incurred by W. & Co. in the current business, and the balance only, together with any balance of profits from the current business, was to be applied upon bottomry; that the proceeds of the draft were not a payment by S., nor his moneys, until the draft was actually paid by him; and at the date of such payment, W. & Co.'s advances and liabilities in the current business being equal to the proceeds of the draft, none of it was then applicable upon the bottomry lien; that, an account having been made up to the first of January following, upon which a balance was stated as due to W. & Co, upon "all the various accounts," the credit to S. appearing in their general account, must be deemed applicable to the bottomry lien, after discharging the debts belonging to the current business. *Held, further,* that two special debit accounts, one of them being a draft of £600, the subject of one of the above suits, being found to belong strictly to current business, properly formed a part of the general account, and the credit balance on that account was first applicable thereto. and that the draft of £600 was thereby paid and extinguished.

*Edward H. Hobbs,* for libelant.

[1] See Magarity v. Shipman, (Va.) 1 S. E. Rep. 109.

*Edward Salomon*, for claimant.

BROWN, J. In May, 1886, Schultz, the owner of the Stettin-Lloyd line of steamers, between New York and Stettin, having failed in business, the steamer Martha, then in this port, was libeled upon numerous claims, including the above suits, upon one of which she was sold, and her proceeds ($50,000) deposited in the registry of the court. The libel first above named is to recover a balance of $9,175.87, alleged to be due on a bottomry bond executed upon the steamer at Halifax, in February, 1885, in the principal sum of $12,115.40. The second suit is upon the master's draft for £600, given to the libelants at New York, April 25, 1885, purporting to be drawn "for necessary repairs and supplies." The petitioners, a German bank, holding a mortgage upon the steamer, were allowed to intervene for the protection of their interests, in the determination of the amount due. They contend that, in the subsequent dealings between the libelant and the owner of the Martha, a larger sum than is credited should be applied in payment of the bottomry bond. In the second suit they claim that the draft was without authority, because the libelants had already funds in their hands sufficient for the supplies in question; and also that it has been paid.

I shall not attempt to indicate more than a few of the leading facts of this complicated case. On the arrival of the Martha in New York, subject to bottomry, the evidence leaves no doubt that Schultz was in pecuniary embarrassment; and that the arrangement made with Wright & Co. was for the double purpose of preventing the speedy sale of the ship for the payment of the bottomry bond, and also to enable Schultz to continue to carry on the business of his line. With this double end in view, he engaged the libelants' firm, Wright & Co., to act as the resident agents of the line in New York, upon their taking up the bottomry bond, and obtaining an assignment of it to themselves, with the agreement on his part that there was no defense against it, and that the lien thereof should not be prejudiced by any delay of Wright & Co. in enforcing it. As a part of the same arrangement, also, Wright & Co. were to negotiate a draft drawn by the master of the Martha upon Schultz, at Gothenberg, payable four days after arrival of the Martha, for £1,700. The draft was accordingly drawn, but Wright & Co. were unable to raise the money upon it, except upon a collateral draft of their own, drawn by them upon Schultz for the same amount, which they gave; and upon both drafts together they obtained, on the second of March, 1885, the sum of $8,117.50. On the following day they paid the holders of the bottomry $13,152.55, the amount due upon it, took an assignment of the bond to themselves, and thereafter attended to the business of the line, until the failure of Schultz, in May, 1886.

When the bottomry bond was taken up by Wright & Co., it was expected that a considerable sum would be received to the credit of the ship on account of the bond, from the general average contributions due from the cargo. During the following year the sums received from this source amounted to $6,410.97, which, with $785.31 received from policies,

were applied by the libelants upon the bottomry account, reducing it to $9,175.87, the amount here claimed, after the payment of considerable other sums for premiums and adjuster's charges, not here disputed.

The mortgagee contends that the amount raised upon the draft of £1,700 should be applied upon account of the bottomry bond. Schultz testifies that such was the intention, while the libelant testifies that it was intended to go to the credit of the line on general account, for the purpose of giving the line credit in New York, and to enable them to conduct its business as agents, without being always largely in advance; and also as security for four notes given by Schultz to them, payable in 30, 60, 90, and 120 days, for a previous debt of about $1,700.

From the evidence it is plain that there was nothing in the negotiation itself, or in the express contract of the parties, that amounted to any specific appropriation of this draft, or its proceeds, to the one account rather than to the other. It was therefore applicable to either, or both, as justice should require.

For the mortgagee, it is contended that it would necessarily be applied by law to a debt already due, rather than to a debt not due, and still more to the bottomry, as against a mere prospective or contingent liability; and that as the bottomry bond was due, and as there was no other obligation of Wright & Co. then actually existing, the whole amount is necessarily applicable upon the bottomry bond, from the start. *Stone* v. *Seymour*, 15 Wend. 19–23; 4 Kent, Comm. (11th Ed.) 468, note.

Without questioning at all the principle invoked, in a case presenting the simple alternative as regards the application of a payment to a debt due, or to a contingent or expected obligation, the principle cannot be justly applied here—*First*, because this is not a case of *payment* at that time by the debtor; and, *second*, because that would manifestly be contrary to the intention of the parties. This intention must in every case control, where it can be determined with reasonable certainty.

In the case of *National Bank* v. *Mechanics' Bank*, 94 U. S. 437, 439, the supreme court say:

"The rule settled by this court, as to the application of payments, is that the debtor or party paying the money may, if he chooses to do so, direct its appropriation. If he fail, the right devolves upon the creditor. If he fail, the law will make the application according to its own notions of justice. Neither of the parties can make it, after a controversy upon the subject has arisen between them, and, *a fortiori*, not at the trial."

Wright & Co., in this case, placed the proceeds of the drafts discounted to the credit of the general account. It is the first item in that account, while a separate and special account was opened in respect to the bottomry bond. Under the circumstances of this case, the fact of placing the draft on the general account I cannot regard as conclusive evidence of the intention of either party that no part of the proceeds of this draft, on payment, should in any event go to the credit of the bottomry account. It was expected, on the contrary, that the business of the line would prove profitable; and, in suspending the payment of the bottomry, there was the undoubted implication and expectation that the

net earnings of the line would go to relieve the ship from this charge. The contemporary letters show this expectation. This draft was, in effect, a draft upon the Martha's outward freights, *i. e.*, upon the Martha's earnings. Like all the other drafts, it is applicable, first, as the accounts correctly show, to pay the current accruing liabilities of the business of the line, and any balance after that should be applied to the bottomry account. Such, I think, was the evident intention. But, until the draft was paid by Schultz, the moneys obtained on it were not his moneys, and the proceeds could not properly be put in any other account than the general account.

It is evident, however, that the negotiation of this draft was a condition of Wright & Co.'s undertaking the agency of the line, and of their taking up the bottomry bond. They certainly had the benefit at once of the moneys raised on it. They were intended to have that benefit, and were in consequence required to advance only about $5,000, instead of $13,000, at that time, since they did not take up the bond until the day after they had procured the money upon a discount of the draft. But as this draft had not been paid, and was secured by their own collateral, it is clear that it could not reasonably be applied at once to the discharge of the bottomry lien,—a lien, which, if once discharged *pro tanto*, could not be resuscitated if the draft were not paid. Wright & Co. could not be expected to part with a lien by bottomry, upon the mere discount of a draft for which they were themselves still responsible. Until payment by Schultz, the £1,700, as I have said, were not the moneys of Schultz; and, in truth, the draft was but a means of assisting Wright & Co., by a discount, to raise the money necessary to enable them to take up the bond at once, as well as to make the other advances needed in fitting out the ships for sea. It aided Wright & Co., but the proceeds could not be definitely applied until the draft was paid by Schultz; and this consideration is also a sufficient reason why, in the agreement given by Schultz at the time, specifying that there was no defense to the bond, nothing was said about the moneys raised upon the draft.

For the outfit of the Martha on her first subsequent voyage, Wright & Co., within a few weeks, advanced the sum of $3,340.16, and other bills remained unpaid; making, in all, about $5,500, all of which were entered as a debit in the general account. The precise date when the captain's draft of £1,700 was due does not appear, since the date of the Martha's arrival is not shown; but the draft bears an indorsement "Paid through bill on London, March 24, 1885." It must have been finally paid, and Wright & Co. informed thereof, not long after the first of April, 1885. At that time, the general account of Wright & Co. would show, if both the bottomry account and the discounted draft were excluded, that they were in advance to Schultz in the sum of about $5,500. Crediting the draft in the general account, they would appear to be in funds, to Schultz's credit, about $2,600; against which still stood the four notes above mentioned, amounting to $1,700, none of which were yet paid, while the necessary disbursements for the Katie's twenty-first voyage were to be soon provided for.

There were also two obligations on which Wright & Co. were liable, as sureties for the vessels, to the amount of about $3,700. But the contract shows that Wright & Co. had incurred these latter obligations as one of the conditions of receiving the agency of the line, and the contract evidently does not contemplate their holding the moneys received from the draft of £1,700 as security for these two contingent liabilities, neither of which has even yet been paid. I think they had no right to hold the moneys received from the draft of £1,700 upon account of those contingent obligations.

The letter written by Schultz on March 21st, from Havre, shows clearly that his understanding had been that this draft of £1,700, when paid, would go to offset Wright & Co.'s advances in current business, and that only the balance, after paying these advances, would go on the bottomry account. The language of that letter is incompatible with the supposition that the whole £1,700 would be at once applied upon the bottomry bond. He refers to the difficulty of meeting the £1,700 draft, and says: I may "have to draw on you for £1,000, at 60 days' sight. * * * If you should not be in funds by the time the note falls due, you may draw back on me, 60 days, London, or take captain's draft," etc. Two days after, he accordingly drew on Wright & Co. for the two sums of $2,500 and $1,215.25, at 60 days from date, which were paid by Wright & Co. when due. Had the £1,700 not been designed in part to offset Wright & Co.'s advances in current business, there could have been no such uncertainty as this letter contemplates. A large debit, as we have seen, must have existed from the first. How much would remain of the proceeds of the £1,700 was the evident uncertainty contemplated, and it was against this excess that Schultz desired to draw. Wright & Co. were therefore authorized to retain this balance against all current advances, including the drafts thus drawn by Schultz upon them, instead of applying it upon the bottomry bond, as otherwise should have been done. That letter has the weight of a nearly contemporaneous act, and it in part sustains the libelant's contention. The two new drafts made by Schultz more than covered what remained of the £1,700 at the time when Wright & Co. could have known of its payment, and left nothing at that time applicable to the bottomry account.

From the general intent and expectation, to which I have above referred, that the net earnings of the Martha, or of the line, should go to reduce the lien upon bottomry, after first providing for all the current expenses and liabilities incurred by Wright & Co., it would follow that any such net credit balances as should subsequently appear at the time of rendering all their general and special accounts ought, in justice, to be deemed so applied. It would be most unreasonable to suppose, unless there were some very clear evidence of the fact, that the parties intended to preserve indefinitely a large credit balance, without any application of it to the outstanding lien by bottomry; and, as I have said, the early letters of Schultz indicate the contrary intention.

In October, 1885, Wright & Co. rendered to Schultz an account of all their various transactions, showing a considerable balance on general ac-

count, and a net indebtedness to them, "upon all the accounts, of $5,710.46, with interest and commissions and expenses, in case of bottomry and average." But the items omitted are of so considerable importance as to make this statement of no use. To this account, which included the £1,700 in the general account, Schultz, though he made some other objections, never objected to the inclusion of the proceeds of the draft of £1,700. But as the final balance upon all the accounts was stated, except as to interest, commissions, etc., he had no interest in the question where the £1,700 was credited; and but little, if any, weight can therefore be given to the circumstance that he made no comment on it. In January following, Wright & Co. rendered a further account, made up to the first of January, 1886. In their letter, inclosing all these accounts, they show a balance to the credit of Schultz, on general account, of $8,634.96, against which were three separate and special accounts, namely: The bottomry bond account, debit balance, $9,753.39; steamer Katie, twenty-first voyage, debit, $4,367.40; the Martha. on her third voyage, debit, $3,107.96. They add "(6) A statement of balances." "This shows," they say, "an amount due January 1st of $8,593.79, which covers all these various accounts inclosed."

The debit on account of the Martha, above referred to, is the same as that of the draft of £600 in suit. When the January statement was received at Stettin, Schultz had arrived in New York, and did not see the account till long afterwards; and, in their interviews here, neither party referred to it. There are some corrections to be made in it on both sides. When corrected, the credit on general account must be applied according to the rights of the parties as they then stood.

The two special accounts were merely protested drafts, drawn by the master upon Schultz, in favor of Wright & Co., in settlement of debit balances on two of the voyages of the Martha and the Katie, in the usual manner. They were a part of the current business of the line. Other items and balances of these and similar voyages were entered in the general account; and there was nothing shown to be peculiar in the nature of these protested drafts that authorizes any legal distinction to be made in respect to them from other items contained in the general account, so far as respects the application of the credit balance. These two "special accounts" of the Martha and the Katie must therefore be first discharged out of the credit balance standing on the general account, because belonging to current business. This would leave a balance of credit of $1,159.60 remaining to be applied on the bottomry account. To this must be added the following items of debit in the general account, which, I think, are not chargeable against Schultz under Wright & Co.'s contract for the agency of the line, viz.: the items of $85, $100, and $100, under date of March 4, 1885, amounting together to $285. Wright & Co. are also to be credited with the error of $180, referred to in their letter of January 1, 1886, making a difference in Schultz's favor in these items of $105; which, added to $1,159.60, makes $1,264.60. This amount should be applied on the bottomry account, as the result of the accounts submitted up to January 1st; and the moneys subsequently re-

ceived specifically on the bottomry account should also be credited. This reduces the amount due upon the bottomry account to $7,911.29, with interest from April 28, 1886; and the draft of £600 must be held extinguished by the application of the credit balance, as stated in the account rendered to January 1, 1886.

The consolidation of all the accounts in striking a final balance up to January 1, 1886, indicates the understanding of Wright & Co. that such application of credit balances was to be thus made. They requested payment of this final balance. Payment of that balance, at that time, would manifestly have discharged the bottomry bond. The general credit balance of that date must be deemed, therefore, applied at that time, as above indicated. As early as the previous eleventh of July, Schultz had written his belief that, in less than three months, "all will be square," through the receipt of passage moneys; and in the same letter he had expressed the hope that Wright & Co. could "hold the old respectively outside accounts over until squared by receipts from passage moneys." The two drafts of £600 and £850 were not then due. Even if they were designed to be embraced in the terms "old outside accounts," which seems difficult to suppose, they were manifestly designed to be paid from the subsequent receipts. It was the subsequent receipts that made the credit balance on general account of January 1, 1886; and Wright & Co.'s offset of them in the statement of the final balance of "all the various accounts" was in accordance with this request.

I find nothing else in the evidence that should prevent the application of the balances as stated in the accounts of January 1, 1886. The supposed liability of Wright & Co. on the captain's draft for $2,653.75 appears, at page 92 of the testimony, not to have been incurred until the ninth of January, after these accounts were made up. The draft was at once negotiated, and was apparently paid by Schultz at maturity, as it does not appear in the present account. All Wright & Co.'s liabilities in the current business, up to January 1, 1886, being thus provided for by their accounts rendered to that date, their subsequent dealings must be deemed incurred on the ordinary risks of the business they had assumed, and independent of the prior accounts.

Decrees may be entered in accordance with the result above indicated.