FIRST NAT. BANK OF NASHVILLE v. NATIONAL SURETY CO.

(Circuit Court of Appeals, Sixth Circuit.   May 9, 1904.)

No. 1,250.

1. APPLICATION OF PAYMENTS—RIGHTS OF SURETY—INDEMNITY INSURANCE FOR SPECIFIC TERM.

Defendant, a surety company, executed a bond to plaintiff bank by which it undertook, for the term of one year, to indemnify plaintiff against loss sustained by the dishonesty of employés.  Action was brought thereon to recover for loss alleged to have occurred during the term through the action of a bookkeeper in falsifying the account of a depositor so as to increase his apparent credit balance, by which he was enabled to and did overdraw his account to a large amount.  Such false entries and overdrafts continued through four years, but defendant's bond covered only about three months of the last part of the bookkeeper's employment, there having been bonds with different sureties covering a portion at least of the previous time.  The depositor's account was the ordinary running account, subject to check, and continuous during all the time, and no application of deposits to any particular item of debit was made by either party, nor by implication, there having at no time been an overdraft as shown by the books.  The false entries and overdrafts continued for a part of the time after defendant's bond went into effect, but subsequent deposits made prior to the time the bookkeeper's employment terminated exceeded the checks paid during the same time in an amount greater than such overdrafts.  *Held,* that the ordinary rule in such cases between debtor and creditor, that payments should be appropriated to the oldest item of indebtedness, could not be applied as against a surety whose obligation covered a distinct portion of the time during which the account was running, but that as between plaintiff and defendant all deposits made during the currency of the bond would be applied by the court to the debit items made during the same time, and, it appearing that they exceeded the sums drawn out, there was no loss to the bank during the term for which defendant was liable.

2. SAME—DISTINCT BONDS FOR DIFFERENT TERMS.

When there are different bonds given by a bank official, covering different periods of time, with different sureties, an unappropriated payment made by the common principal is not to be always applied by the court to the oldest obligation.  Regard must be had to the responsibility of the different sureties, as limited by the period for which they respectively contract, as well as to the injustice that would ensue if collections received under one obligation are applied to the discharge of a liability under a preceding or succeeding term, with distinct sureties.

In Error to the Circuit Court of the United States for the Middle District of Tennessee.

Walter Stokes and James C. Bradford, for plaintiff in error.
Granbery & Trabue, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, delivered the opinion of the court.

This was an action by the First National Bank of Nashville, Tenn., against the National Surety Company, on a bond of indemnity made by the latter company, to recover a loss sustained through the dishonest conduct of one W. W. Lea, an individual bookkeeper in the service of the bank.  Upon the pleadings and evidence Judge Clark directed a verdict for the surety company.

130 F.—26

By the bond the surety company agreed to pay to the bank "the amount of any loss or damage that shall happen to the employer, in respect of any funds, property or estate belonging to or in the custody of the employer, through the dishonesty of any of the employees, or through any act of omission or commission of any of the employees, done or omitted in bad faith, and not through mere negligence, incompetency, or any error of judgment," etc. The bond covered a number of the bank's employés, of whom W. W. Lea was one. Lea was the bookkeeper, and kept the individual ledger containing accounts of those depositors the initial letters of whose names were one of the letters of the alphabet from A to K, inclusive. Among those depositors whose accounts were kept by him was the mercantile firm of Connor & Brady. This firm did business with the plaintiff for a number of years. Their account was what is called an "active" one, and almost daily deposits were made and checks drawn thereon. Lea neither received nor paid out any money. Deposits were paid to the receiving teller, who, during same day, turned over to the assistant teller memoranda of the deposits called "deposit slips." A list of these was made out by the assistant teller, which was handed to the individual bookkeepers, who entered therefrom, on a book called the "scratcher," the amount of each deposit and the name of the depositor. Checks were paid by the paying teller, who, after payment, turned same over to the assistant teller, who, after making a list of them, handed them to the individual bookkeepers. The latter then entered them on the scratcher. At the close of each day the individual bookkeepers transferred from the scratcher to the individual ledgers the deposits and checks thus recorded thereon. This ledger should therefore show deposits and checks corresponding with the entries made on the scratcher. The account of each customer was balanced at the end of each day, and, if properly kept, showed the precise condition of the depositor's account after crediting each deposit and charging each paid check. The account of Connor & Brady was in this way kept by Lea. There was evidence tending to show that in the interest of Connor & Brady, and for the purpose of defrauding the bank, the account of that firm was falsified in three distinct ways, the object being to give Connor & Brady fictitious credit balances against which they could draw. One of the methods was to post from the scratcher a larger deposit than shown. To illustrate: On July 2, 1900, the firm deposited $503.70, which was honestly entered by Lea on the scratcher from the deposit slips handed him by the assistant teller. In posting this to their account on the individual ledger, this deposit was entered as $1,503.70. Another method was by charging a check as for a less amount than shown by the scratchbook entry. Thus, on June 29, 1900, checks drawn by them were paid which aggregated $631.10, and were properly entered on the scratcher, but posted in their ledger account as $331.10, thus increasing their credit balance by $300. A third method was by false extensions of footings and balances. An example is this: On May 7, 1900, by false additions, their credit balance was increased $1,000. This system of false entries was begun and continued for nearly five years, and on May 1, 1900, Connor & Brady had overdrawn their account $50,029, although the account on the ledger did not show

any overdraft at all, in consequence of the skill with which fictitious credits had been given them through Lea's methods. Detection had been successfully avoided by methods not necessary to state, and on May 1, 1900, Lea bore an untarnished reputation, and was so represented for the purpose of securing the bond now in suit, which went into force, as of that date, for the term of one year. For the loss which had or might be sustained as a consequence of Lea's dishonest methods prior to the currency of this bond, it is not sought to hold the appellee responsible. For the two years preceding May 1, 1900, a bond with a different surety had been in force, and during that term of two years it is shown that Connor & Brady had increased their overdraft by about $21,000, and for that loss a claim was made against the surety company responsible. This suit is for the loss incurred through the continuance of Lea's dishonest practices during the currency of the bond made by the National Surety Company.

The contention is that, through false entries made after May 1, 1900, the credit balance of Connor & Brady was fraudulently increased to the extent of $3,384.71, and that for this amount the surety company is liable. Lea neither received nor paid out a dollar of the bank's money. He was only a bookkeeper, and his dishonesty consisted only in so falsifying the account of Connor & Brady as to enable that firm to overdraw its account. The mere fact that Lea fraudulently increased the balance in favor of Connor & Brady by any of the methods described is not enough to fasten responsibility upon his surety. The bond is to indemnify the bank against any "loss" through his dishonesty. It follows, therefore, that unless Connor & Brady, through Lea's fraudulent practices, did draw out more money by check than they deposited, no loss would be shown. Now the plaintiff says that this is just what did occur, and that Connor & Brady did draw out $3,384.71 more than they deposited. And so it was shown that between May 1, 1900, and July 16, 1900, the checks drawn by Connor & Brady and paid by the bank exceeded their deposits by $3,384.71. If the account had then been closed and Connor & Brady did not make this overdraft good, a case of a "loss" under the bond would be made out. But the defendant says the account was not then closed, and that Connor & Brady continued to make deposits and draw checks, and that by August 6, 1900, their aggregate deposits after May 1, 1900, had exceeded their checks by more than $500, and that, when the account was finally closed by the bankruptcy in November of 1900, their excess of deposits over checks was more than $10,000, and that the bank did not, after the bond went into effect, sustain any loss by reason of Lea's practices.

During what period of this time was the bond operative as an indemnity? The term contracted for was one entire year. But it was evidently subject to termination by the discontinuance of Lea's services, for in that event there would be no one upon which it could operate. On July 16, 1900, Lea was given a two-weeks vacation, in pursuance of a general custom of the bank, during which his salary went on. He was due to return August 1st. He did not return then or at any other time. Whether his vacation was extended does not appear. No reason for suspecting his books was entertained when he went

away, and the testimony of Mr. Watts, the cashier of the bank, was that between August 8 and 12, 1900, it was ascertained that his books "were out of balance with the general ledger, and thereupon an expert was put upon the books to ascertain whether or not this information was the result of fraud and dishonesty upon the part of Lea." That the bank did not regard Lea as out of its service prior to this discovery is clear, for as late as August 17th the cashier wrote to the surety company, saying, among other things:

"Mr. Lea left our offices recently to take his vacation under custom recently adopted and has not yet returned. There is a chance for his accounts to be irregular and we are now beginning an investigation."

He was absent on leave, and with salary, up to August 1, 1900. Manifestly his employment continued up to that date. The account exhibited shows that up to July 26th there was a gain in deposits over checks paid of $1,767.75, and the cashier testifies that by August 6th the deposits exceeded checks by more than $500. There was no suspicion as to the correctness of Lea's books before August 8th, and no reason for regarding his employment as ended until his absence beyond his leave was explained by discovery of his frauds. We therefore conclude, as an inference of law and fact, that his employment did not terminate prior to the discovery of facts casting suspicion upon his books. The bond was therefore in force at least up to August 6, 1900, at which date the deposits during its currency exceeded checks drawn and paid during same period.

Now, if we are to segregate the account of Connor & Brady during that period beginning May 1, and ending August 6, 1900, no loss resulted from Lea's fraudulent entries, because the deposits during that time exceeded checks drawn against the account. But the bank contends that the account of Connor & Brady shows that on July 16, 1900, it was overdrawn $3,384.71, and that this overdraft was made possible only by the concealed fraudulent posting of their account by Lea, and that at that date the bank had actually sustained the loss for which it now sues, and that the deposits made after July 16, 1900, should be applied as payments upon the oldest items of overdraft, and not in satisfaction of the overdrafts occuring during the currency of the bond. This presents a question of appropriation of payments of much perplexity. The account of Connor & Brady did not on its face show any overdraft, either before or after the bond in suit went into effect. The deposits made were not made under any special arrangement. The account was the ordinary running banker's account. Deposits were entered on one side as credits and checks, on the other as debits, and by the custom of the bank a balance was struck at the close of each day. This account ran along in this way for years. If the account had been honestly kept, there would have appeared an overdraft of $50,000 against Connor & Brady on May 1, 1900, and all deposits after that date would, according to the method of keeping such accounts, go in the diminution of the overdraft, in the absence of some other arrangement. But as this overdraft did not appear, the deposits after May 1, 1900, apparently constituted a fund subject to check. Neither did the account as it appeared on July 16th show the overdraft of $3,384.71, which in fact existed, though concealed by Lea's fraud.

Thus at no time was there even an apparent application of deposits to the payment of an overdrawn account. There was therefore no express or implied appropriation of the deposits made by Connor & Brady by the bank or the depositor to any particular purpose, and counsel for the bank concede that this is a case where "it remains for the law to make the application according to its own notions of justice."

Upon an examination of the decided cases bearing upon the rule which should control a court in making an appropriation when the parties have made none, we confess to a sense of disappointment that the definite principles which should guide a court are so few and subject to so many qualifications. The artificial rules of the civil law have sometimes been applied by American and English courts, but not with such uniformity as to furnish a safe rule of decision. Story, Eq. Jurisprudence, §§ 459c and 459d; Blackmore v. Granbery, 98 Tenn. 277, 39 S. W. 229.

The learned counsel for the bank insists that the general rule laid down in many cases, and particularly in United States v. Kirkpatrick, 9 Wheat. 720, 737, 6 L. Ed. 199, is applicable here. That rule, as stated by Justice Story in the case referred to, is "that, when there are long and running accounts where debits and credits are perpetually occurring, and no balances are otherwise adjudged than for the mere purpose of making rests, that payments ought to be applied to extinguish the debt according to the priority of time, so that credits are to be deemed payments pro tanto of debts antecedently due." But this rule has many qualifications, and it remains to be seen whether it is applicable under the circumstances of this case. This account was, it is true, a running account. It may also be conceded that the relation of banker and depositor, in the absence of some special arrangement, is that of debtor and creditor, and that when money is deposited it becomes the money of the bank. National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693; Grissom v. Comm. Nat. Bank, 87 Tenn. 350, 10 S. W. 774, 3 L. R. A. 273, 10 Am. St. Rep. 669. So, too, checks drawn by a depositor are not drawn against any particular item of deposit theretofore made, but against the account generally, and between banker and depositor the general rule of appropriation of payments is ordinarily applicable.

In Clayton's Case, 1 Merivale, Ch. R. 572, 608, a question arose as to the liability of a deceased partner in a banking firm for a balance due to a depositor at his death. But it appeared that while the business was being carried on by the supervising partners the depositor continued to make deposits and draw checks. The question in the case was whether checks so drawn were to be treated as drawn against the more recent deposits or those made before the defendant's death. It was held that the money drawn out was presumably that first put in, and the debt for which the deceased partner was liable thus paid off, leaving the surviving partners alone liable for the balance due the plaintiff. Sir William Grant, among other things, said:

"Presumably it is the sum first paid in that is first drawn out. It is the first item on the debit side of the account that is discharged or reduced by the first item on the credit side. The appropriation is made by the very act

of setting the two items against each other. Upon that principle all accounts current are settled, and particularly cash accounts. When there has been a continuation of dealings, in what way can it be ascertained whether the specific balance due on a given day has or has not been discharged, by examining whether payments to the amount of the balance appear by the account to have been made? You are not to take the account backward and strike a balance at the head instead of the foot of it."

If this was a case between the bank and its depositor, and the rights of a surety for a limited period of the time covered by the account were not involved, it would be of easy disposition, for in such a case it would be plain that every deposit would be automatically applied to the credit side of the running account, thereby either enlarging the credit balance or diminishing the debtor balance. Every check would presumptively be paid by the first item of deposit, according to the principles of Clayton's Case. But this is not Clayton's Case, and is quite distinguishable from it, by reason of the fact that this is not a question as to the fund out of which a check is presumably paid, but one of the application of deposits, and the more important fact that the rights and equities of a surety for a limited period cannot be ignored when we come to the appropriation of payments. These practices of Lea's ran on for about four years. For the two years preceding the bond in suit he was bonded by a different surety company. Whether he was under bond prior to that time does not appear. If this doctrine of arbitrarily applying every deposit made by Connor & Brady to the oldest item of overdraft is to be followed, it would be difficult to see how any liability could be fastened upon any preceding surety for Lea, for the deposits made during the currency of the last bond were more than enough to discharge any overdraft during the currency of such prior bonds.

That the general rule of applying every unappropriated payment to the oldest item of debt is subject to qualification where the rights and equities of third persons are involved, is the teaching of such cases as U. S. v. January, 7 Cranch, 572, 3 L. Ed. 443, U. S. v. Eckford's Executors, 1 How. 250, 11 L. Ed. 120, and Jones v. United States, 7 How. 681, 12 L. Ed. 870. In U. S. v. January, 7 Cranch, 572, 3 L. Ed. 443, it appeared that the supervisor had kept one general account only against a collector who had served two successive terms under two bonds and with different sureties. At the end of his entire service there was a balance due on this general account of $16,181, for which suits were started on each of the bonds. By terminating the account with the period ending when the second bond was given, it appeared that only $6,483,59 was then due. The surety upon the first bond claimed that subsequent payments by the collector should be applied in discharge of this the oldest item in the account, and evidence was offered to show that the supervisor had promised to apply such subsequent payments in discharge of the original liability, and the Circuit Judge instructed the jury that whether an entry had been made showing an express application in accordance with this promise was immaterial; that, if he had promised to so apply subsequent payments, the application should be treated as made. The Supreme Court, after stating the general rule in reference to the application of payments, said:

"In this case a majority of the court is of opinion that the rule adopted in ordinary cases is not applicable to a case circumstanced as this is, where the receiver is a public officer, not interested in the event of the suit, and who receives on account of the United States, where the payments are indiscriminately made, and where different sureties, under distinct obligations, are interested. It will be generally admitted that moneys arising due, and collected subsequently to the execution of the second bond, cannot be applied to the discharge of the first bond without manifest injury to the surety in the second bond, and, vice versa, justice between the different sureties can only be done by reference to the collector's books, and the evidence which they contain may be supported by parol testimony, if any, in the possession of the parties interested. The court is of opinion that the Circuit Court erred in the opinion given, and that it be reversed."

In U. S. v. Eckford's Executors, 1 How. 256, 11 L. Ed. 120, it appeared that the collector had served three terms under different bonds with different sureties. At the end of the first term a large balance was charged against him arising under the previous term, and at the commencement of the third term a balance was charged against him arising under the second term. Suit was brought upon the second bond, and a question arose as to whether payments made by the collector after his third term had begun should be applied to the discharge of his liability under his bond for the second term. By the system in which the account had been kept by the Treasury Department, all of the sureties except those for the last term would be discharged, inasmuch as the balance due at the end of one term was carried forward as a charge against the succeeding term, and payments subsequently made credited in discharge of the balance so brought forward. This method was defended as being sanctioned by the general rule which permits the debtor or the creditor to appropriate payments, and Clayton's Case, 1 Merivale, 606, was much relied upon. But the court said that it did not regard the doctrine applicable, but that the case was governed by U. S. v. January, 7 Cranch, 572, 3 L. Ed. 443, different sureties under different obligations being interested. Among other things, the court said:

"The officers of the treasury cannot, by any exercise of their discretion, enlarge or restrict the obligation of the collector's bond. Much less can they, by the mere fact of keeping an account current, in which debits and credits are entered as they occur, and without any express appropriation of payments, affect the right of sureties. The collector is a mere agent or trustee of the government. He holds the money he receives in trust, and is bound to pay it over to the government as the law requires. And in the faithful performance of this trust the sureties have a direct interest, and their rights cannot be disregarded. It is true, as argued, if the collector shall misapply the public funds, his sureties are responsible. But that is not the question under consideration. The collector does not misapply the funds in his hands, but pays them over to the government, without any special direction as to their application. Can the treasury officers say, under such circumstances, that the funds currently received and paid over shall be appropriated in discharge of a defalcation which occurred long before the sureties were bound for the collector, and by such appropriation hold the sureties liable for the amount? The statement of the case is the best refutation of the argument. It is so unjust to the sureties, and so directly in conflict with the law and its policy, that it requires but little consideration.

"If the collector be in default for a preceding term, it is the duty of the Treasury Department to require payment from him and his sureties for that term. To pay such defalcation out of accruing receipts during a subsequent term, even with the assent of the collector, would be a fraud upon the sureties

for such term. The money in the hands of a collector is not his money. Without a violation of his duty, he cannot appropriate it as such. He pays it over in the performance of his duty—the duty which the sureties have undertaken that he shall faithfully perform. And shall the sureties not be exonerated? The collector has done all that they stipulated he should do. How, then, can they be made responsible? It is contended that their responsibility arises, not from the default of the collector, but from the appropriation of his payments by the treasury. This, at least, is a fair result of the doctrine advanced. For, if such appropriation is properly made by the treasury, in payment of a defalcation of the collector before the commencement of a current term, it must follow that the sureties for such term are responsible for the amount thus paid."

In Jones v. U. S., 7 How. 681, 688, 12 L. Ed. 870, it was held that, when a running account is kept at the Post-Office Department between the United States and the Postmaster, in which all postages are charged to him and credit given for all payments made, this mode of keeping the account amounted to an election by the creditor to apply the payments, as they are successively made, to the extinguishment of preceding balances. But the court, referring to the cases we have cited above, said:

"In instances of official bonds executed by the principal at different times, with separate and distinct sets of sureties, this court has settled the law to be that the responsibility of the separate set of sureties must have reference to, and be limited by, the periods for which they respectively undertake by their contract," etc.

It is a mistake to say that these cases decided by the United States Supreme Court are to be regarded as resting upon any peculiar public policy, or that the principle is applicable only to the bonds given by governmental officials. The fundamental idea upon which the cases rest is that the rights and interests of independent sets of sureties for distinct periods of time would be unjustly sacrificed by applying payments arbitrarily to the oldest debt. That the cases all involved public officials and official bonds seems to afford no reason for limiting them to official bonds.

These judgments are undoubtedly in conflict with such cases as Gwynne v. Barnes, 7 Clark & F. Rep. H. L. Cas. 571; New Jersey v. Sooy, 59 N. J. Law, 539; Seymour v. Van Slyck, 8 Wend. 403; Stone v. Seymour, 15 Wend. 19; and Inhabitants of Sandwich v. Fish, 2 Gray, 298—in all of which cases it seems to have been held that, when an official has held several successive terms under bonds with different sets of sureties, he may apply the revenue arising in one term to the payment of a balance due under a former term, and thus exonerate one set of sureties at the expense of another. Neither does the fact that the official receiving the payment was aware of the source of the money seem to have been regarded as material. In the New Jersey Case the injustice of this unqualified right of the debtor to apply a payment as he pleases, and without regard to its effect upon independent sets of securities, is, in part, put upon the ground that to hold otherwise would subject the public to loss by rascally officials whose honesty had been guarantied by the complaining sureties.

State v. Smith, 26 Mo. 226, 72 Am. Dec. 204, has also been cited by counsel for the bank as an authority supporting the general right of an official debtor to supply his payments on any one of two or more

liabilities. But the Missouri court ruled that, if the treasurer receiving the payment knew that the money arose from current collections, the state would not be permitted to so apply it as to do a wrong to the security upon the current bond. This would seem to be a qualification commending itself to the conscience of a court by reason of principles of common honesty. But in the case at bar neither the debtor nor the creditor has made any appropriation, and the deposits made were of the money of the debtor, and unaffected by any equitable charge in favor of either set of sureties, or the bank as the debtor. It was therefore quite within the general rule that Connor & Brady should have the right to apply their deposits to any debt due by them to the bank. But they made no appropriation whatever, and the right and duty of regarding the rights of successive sets of sureties, when the court is called upon to make an appropriation, is conceded in the cases which maintain most strongly the debtor's right to apply his payments without regard to the source of the money or the rights of sureties. Thus, in Seymour v. Van Slyck, 8 Wend. 404, it was held that, where sureties are bound for the payment over of moneys by their principals, and a general account has been kept with the principal in which all debts and credits are entered, the court should not apply the payments to the oldest item of debt, "if in the progress of the account there be a change of sureties," and that in such circumstances, there being no appropriation by either party, "each set of sureties is entitled to the benefit of the moneys received during the period of their respective suretyship." This rule was approved on appeal in Stone v. Seymour, 15 Wend. 19, 33, after an elaborate consideration of the principles upon which the courts should proceed in applying payments. In State v. Sooy, 39 N. J. Law, 539, 546, it was also recognized that, when the court is called upon to appropriate payments, the equities of third persons should be regarded. How these equities should be regarded is, we think, plainly indicated by the opinions of the Supreme Court in U. S. v. January, United States v. Eckford's Executors, and Jones v. United States, heretofore cited.

Having regard to the terms of the bond, we conclude that the surety company is only liable for the difference between the deposits and checks of Connor & Brady during the running of the bond. If the amount they deposited during that period exceeded the amount they drew out, no loss resulted from the fraudulent practices of Lea during the currency of the bond. The account being thus stated, the court below did not err in directing a verdict for the surety company.

Judgment affirmed.